[807 NYS2d 44]

Victoria Gallegos, Respondent, v Elite Model Management Corporation et al., Defendants, and Gerald Marie et al., Appellants.

First Department, December 29, 2005

## APPEARANCES OF COUNSEL

*Hoguet Newman & Regal, LLP*, New York City (*Joshua D. Rievman* and *Sarah K. Barickman* of counsel), for Gerald Marie and Mary Ann D'Angelico, appellants.

*Salans*, New York City (*Peter J. Gallagher* and *Paul C. Gunther* of counsel), for Monique Pillard, appellant.

*Beldock, Levine & Hoffman, LLP*, New York City (*Robert L. Herbst* and *Spencer Freedman* of counsel), for respondent.

## OPINION OF THE COURT

GONZALEZ, J.

On this appeal, we must decide whether the trial court's substitution of two alternate jurors in the place of two discharged jurors, after deliberations had commenced and without defendants' consent, violated defendants' constitutional and statutory right to a civil trial jury of six persons who deliberate on all matters. Because we find that absent the parties' consent, the procedure employed by the court violates both the State Constitution and CPLR 4106, we vacate the damages verdict and remand for a new trial on damages only. We also reject defendants' additional arguments that certain charging errors require vacatur of the liability verdict.

In this employment discrimination action, plaintiff Victoria Gallegos alleges that her former employer, Elite Model Management Corporation, failed to provide her with a reasonable accommodation for her asthma-related disability. She further asserts that defendants created a hostile work environment because of her disability and fired her in retaliation for asserting her rights under the state and city antidiscrimination laws.

The trial evidence established that plaintiff was recruited for employment at Elite by John Casablancas, its cofounder and majority shareholder. It was Casablancas's intention to hire and train plaintiff to become an executive coordinator, who would

integrate Elite's modeling, booking and client operations. In August 1999, plaintiff interviewed with defendants Monique Pillard, Elite's cofounder and president, and Mary Ann D'Angelico, its director of finance. During this meeting, plaintiff informed Pillard and D'Angelico that she suffered from an asthma condition that required a smoke-free environment. She specifically told them that she could not work at Elite unless the no-smoking laws were enforced. Based on defendants' assurances that they would accommodate her condition, plaintiff accepted the position.

Plaintiff commenced her employment at Elite on September 20, 1999, whereupon it soon became clear that the no-smoking laws were not being enforced at Elite's premises. As part of her training, plaintiff was required to work closely with the company's bookers, many of whom were heavy smokers. Plaintiff made repeated requests to Pillard, Casablancas, D'Angelico and Gerald Marie, a copresident of Elite, to enforce the no-smoking laws and accommodate her need for a smoke-free environment. With the exception of a single memo from D'Angelico, circulated on September 27, 1999, which stated that smoking was not permitted on the premises, defendants made no efforts to enforce the smoking prohibition or accommodate plaintiff's condition.

On October 11, 1999, plaintiff was advised that she would be sitting with the bookers the next day. In response to plaintiff's concerns about the heavy smoking, D'Angelico suggested that she bring a gas mask. In addition, plaintiff testified that she experienced other acts of harassment, such as when she discovered 10 matchbooks placed in the top drawer of her desk, and another time when a cigarette lighter was attached to her cell phone with a rubberband. Although plaintiff reported these incidents to defendants and continued to request an accommodation for her condition, defendants failed to take any action to alleviate the problem.

On October 26, 1999, plaintiff was informed that her job responsibilities had changed and she was to become a booker. After being told that she could either accept this lower position or leave, she accepted. Meanwhile, her asthma condition worsened due to her exposure to smoke at Elite. She suffered at least two serious asthma attacks and, on November 3, 1999, her doctor diagnosed sinusitis and recommended that she undergo a nasal endoscopy to determine the extent of damage to her sinuses. When plaintiff returned to work on November 5, 1999, she told

D'Angelico about her diagnosis and asked Elite to cover the cost of her endoscopy.

Later that day, plaintiff was given a letter from Elite's counsel, accusing her of dramatizing her illness and advising her to stay home on paid leave while considering whether she wanted to continue at Elite. Plaintiff asked D'Angelico if she was being fired, and D'Angelico responded that she should consult an attorney. On November 8, 1999, plaintiff received a letter formally terminating her employment.

Plaintiff commenced the instant action against Elite and the individual defendants for discrimination based on her disability in violation of the New York State and New York City Human Rights Laws (Executive Law § 296; Administrative Code of City of NY § 8-107), and for intentional infliction of emotional distress. Following a six-week liability trial, the jury returned a verdict in favor of plaintiff. The jury found that each of the defendants was liable for failing to accommodate plaintiff's disability; that plaintiff's disability was a motivating factor in Elite's decision to terminate her; that each defendant was liable for subjecting plaintiff to a hostile work environment; that plaintiff's termination was retaliatory; and that defendant Elite was liable for punitive damages. After a separate damages trial, the jury awarded plaintiff $673,590 for lost earnings, $2 million for pain and suffering and $2.6 million for punitive damages against Elite.

During jury deliberations in the damages trial, two sitting jurors were discharged after revealing that one of them had contact with defendant D'Angelico in the ladies restroom during the damages trial. The juror involved had told the second juror about this incident. According to the first juror, D'Angelico told her in the restroom that "the reason [plaintiff] got fired from Barney's was because she tried to bring a lawsuit against them," to which the juror responded, "that figures." After being assured by both jurors that none of the other jurors were aware of this incident, the court discharged them and substituted the two alternate jurors. The court informed the newly constituted panel that "you are going to start the deliberations from scratch . . . there is to be no conversation about what was discussed before the new jurors, the former alternates were placed on the jury . . . [i]t is as if you were starting from the very beginning."

Subsequently, defendants moved pursuant to CPLR 4404 (a) to vacate the liability verdict, vacate or substantially reduce the

damages verdict, or, alternatively, to direct a new trial on liability and damages. Defendants argued that the trial court disregarded the mandate of CPLR 4106, which requires that the court discharge the alternate jurors after the case is submitted to the jury, and by substituting those alternate jurors. They further urged that the jury's compensatory damage awards were speculative and grossly excessive.

The trial court granted the motion solely to the extent of ordering a new trial on damages for pain and suffering unless plaintiff stipulated to a reduction of those damages to $1.1 million. The court also ruled that defendants' argument concerning the alternate jurors was unpreserved, since defense counsel did not object to the initial retention of the alternates or their eventual substitution.

On appeal, defendants Pillard, Marie and D'Angelico argue that the court committed reversible error at the damages trial by retaining two alternate jurors after the case was submitted to the jury and by substituting the alternates for two original jurors in the middle of jury deliberations.[1] We agree.

New York's rules governing the composition of civil trial juries are found in CPLR article 41 and the State Constitution. CPLR 4104 succinctly states that "[a] jury shall be composed of six persons." Further, as authorized by article I, § 2 of the State Constitution, CPLR 4113 (a) expressly provides that "[a] verdict may be rendered by not less than five-sixths of the jurors constituting a jury." Reading these provisions together, the Court of Appeals has held that absent consent to trial by less than six jurors, the parties to a civil case have a constitutional right to a trial by a full six-member jury (*Sharrow v Dick Corp.*, 86 NY2d 54, 59-60 [1995] [where parties to a civil case have not agreed to trial by fewer than six jurors, a valid verdict requires that all six jurors participate in the underlying deliberations]).

CPLR 4106 reinforces this constitutionally mandated six-person jury requirement. CPLR 4106 authorizes the selection of "alternate jurors," who are to be seated with and treated in the same manner as regular jurors, "except that after final submission of the case, the court *shall* discharge the alternate jurors" (emphasis added). As explained in *People v Ryan* (19 NY2d 100, 104 [1966]):

"The reason that there is no provision for substitu-

---

1. Defendants Elite and Casablancas have not appealed the judgment.

tion after the case has been submitted to the jury is that the Advisory Committee felt that '[i]t is in only rare situations that the procedure could be used, and it is believed that an alternate juror who enters the jury room after deliberation has begun is not fully qualified to render an intelligent verdict, having missed part of the discussion and consideration which makes up the deliberative process.' (Second Prelim. Report of Advisory Committee on Practice and Procedure [N.Y. Legis. Doc., 1958, No. 13], p. 228.)"

These same concerns were reflected in *Ryan* itself, which involved the substitution of an alternate juror for an ill juror after five hours of jury deliberations in a criminal case. The Court explained that such procedure, despite being authorized by statute, violated the defendant's constitutional guarantee to a trial by a jury of 12:

"We believe that the Constitution of this State, as it has been construed, prohibits the substitution of an alternate juror—in effect a 13th juror—after the jury has begun its deliberation. While it may be difficult in an individual case to evaluate the extent to which a defendant may be prejudiced by such a substitution, we believe that, once the deliberative process has begun, it should not be disturbed by the substitution of one or more jurors who had not taken part in the previous deliberation and who had cease[d] to function as jurors" (*Ryan*, 19 NY2d at 104-105 [citation and internal quotation marks omitted]).

Although *Ryan* was a criminal case, its rationale is equally applicable to civil actions because the right to a jury trial is guaranteed by the State Constitution in both civil (6 jurors) and criminal (12 jurors) cases (*see* NY Const, art I, § 2; *People v Page*, 88 NY2d 1, 5 [1996] [State Constitution guarantee of right to a trial by jury contemplates jury of 12 persons]; *Sharrow*, 86 NY2d at 59-60 [constitutional right to jury trial contemplates that six persons participate in deliberative process]). *Ryan* stands for the proposition that absent consent, the substitution of an alternate juror after deliberations have commenced violates the parties' state constitutional right to a jury trial and any resulting verdict is therefore invalid.

Here, despite the trial court's initial recognition that postsubmission substitution would constitute "fundamental error," the

court changed its mind and, upon discharging two of the sitting jurors, substituted the two alternate jurors and instructed the jury to begin deliberations anew. However, like the alternate juror in *Ryan*, the two alternates here had not participated in the beginning of the deliberations and therefore were not on equal footing with the original four jurors, who already had the opportunity to weigh the evidence, consider the views of their fellow jurors, and possibly had formed preliminary positions regarding their ultimate verdict (*see Ryan*, 19 NY2d at 103). In the worst case scenario, deliberations may have progressed to a stage where those four jurors had reached substantial agreement, presenting a "formidable obstacle" to any attempt by the two alternates to sway the others to their view (*id.*). Because of these potential problems and the fact that eight, not six, jurors were ultimately involved in these deliberations, *Ryan* compels the conclusion that, absent consent, the verdict cannot stand.

Supreme Court rejected defendants' argument concerning the improper substitution of the alternate jurors on the ground that the argument was not preserved by objections at the time of the jurors' retention and substitution, relying on this Court's decision in *Fader v Planned Parenthood of N.Y. City* (278 AD2d 41 [2000]). There, the plaintiff contended that the court violated CPLR 4106 by not discharging the alternates after the case was submitted to the jury, allegedly resulting in an improper "commingling" of alternate and regular jurors (*id.* at 42). We held that the plaintiff had failed to preserve the argument for appellate review because he did not object to the retention of the alternate jurors at the time they were retained and did not raise the commingling claim until after the jury had been discharged.

*Fader* is distinguishable from this case in two separate respects. First, even though the alternate jurors in *Fader* were not discharged as required by CPLR 4106, they were never substituted as jurors and thus played no role in the deliberations or verdict. Thus, unlike this case, the parties' constitutional right to a six-person jury was not implicated in *Fader* and the *Ryan* rule had no application. *Fader* is also distinguishable because "[n]one of the parties objected" when the court announced that it was retaining the alternates for possible future substitution (*id.*). Here, in contrast, the record shows that defense counsel did object to the court's retention of the alternates, on more than one occasion.

Prior to the submission of the case to the jury, plaintiff's counsel requested that the court keep the alternates "on call"

after the jury begins deliberations, so that in case one of the regular jurors becomes incapacitated an alternate could be substituted. In response to counsel's suggestion, the following colloquy occurred:

"[DEFENSE COUNSEL]: I have no problem, your Honor. I don't know what your experience is in doing that.

"THE COURT: I have never done it. I've never done it. My understanding is that once they start deliberating, you can't add alternate jurors. And even if you tell them to start from scratch, they're really not starting from scratch and they're not going to be able to be privy to all the discussions that have taken place and the decisions that have been made prior to their coming. I don't think it would stand up on appeal. But, if its on consent, you know, your other alternative is, if you lose a juror, you can consent to having five jurors render a unanimous verdict.

"[PLAINTIFF'S COUNSEL]: That would be preferable. If [defense counsel] will be willing to do that, then you won't have that problem.

"[DEFENSE COUNSEL]: We don't have a problem with that.

"THE COURT: My problem is I think it is a fundamental error.

"[PLAINTIFF'S COUNSEL]: I don't think so. It is a procedure I have seen utilized before.

"THE COURT: Nobody appeals, you can get away with it. Is nobody going to appeal that?

"[DEFENSE COUNSEL]: Well, we don't know what the law is on it.

"THE COURT: You see? I won't do that unless everybody consents.

"[PLAINTIFF'S COUNSEL]: He's consenting.

"[DEFENSE COUNSEL]: But I don't know what the law is.

"THE COURT: Consent not to take an appeal.

"[DEFENSE COUNSEL]: I'm not going to consent not to take an appeal if something is wrong with procedure. I'm not going to consent without knowing. The Court is right, that's why I posed the question. . . .

"[DEFENSE COUNSEL]: That's why I asked your Honor for your view of it. If it is something you did, then I have no problem with it. If you think there is going to be fundamental error, then I'm not consenting to it. . . .

"[PLAINTIFF'S COUNSEL]: If you don't dismiss them, at least you have [] the option to consider it if the problem comes up.

"THE COURT: We're going to have this argument all over again.

"[PLAINTIFF'S COUNSEL]: Only if it happens.

"[PLAINTIFF'S COUNSEL]: By then we can do research.

"THE COURT: All right. Okay.

"[DEFENSE COUNSEL]: One other thing, your Honor.

"THE COURT: I'm not agreeing to it, I'm going to go through the motion."

After this discussion, the court informed the alternates that they were being kept on call and should remain available by phone. Defense counsel raised no additional objection at this time. Some hours later, the issue of the juror's contact with D'Angelico arose, and the court spoke at length with both jurors in the presence of counsel. After these discussions, plaintiff's counsel urged the court to discharge the two tainted jurors, to empanel the two alternate jurors and to direct the newly constituted jury to recommence deliberations from the beginning. The following colloquy ensued:

"THE COURT: Okay, I get the message.

"[PLAINTIFF'S COUNSEL]: and begin the deliberations from the beginning.

"THE COURT: Anything from defendant's side?

"[DEFENSE COUNSEL]: I just don't know if everything has been poisoned they can't deliberate. I agree it's

a shame after all this time has been spent on this case to have a mistrial, but I think the call is your Honor's.

"[OTHER DEFENSE COUNSEL]: We don't know. I mean, we had this discussion the other day concerning the use of alternates and I hoped that we would never have to cross the bridge where we would have to ascertain what the law was, whether or not this was going to be reversible error by doing. I still don't know the answer to that.

"THE COURT: Well, in the interest of preserving the nine weeks that we have been at trial, I'm going to go out on a limb and I'm going to replace the two jurors. I don't think that even if I get reversed, we wouldn't be any worse off than we would have been if I declared a mistrial."

Contrary to Supreme Court's finding in its denial of defendants' motion to vacate the verdict, defense counsel did object to the retention and substitution of the alternate jurors. Although he initially stated that he had "no problem" with the retention, after hearing the court's belief that it would constitute "fundamental error" on several occasions, counsel firmly stated "If you think there is going to be fundamental error, then I'm not consenting." Given this clear objection, plaintiff's argument appears to have shifted to the assertion that defense counsel did not properly follow up on this objection, or that the objection was not "unambiguous."

While defense counsel's objection could have been more forceful, the fact remains that he did raise the objection and he never expressly consented to any substitution. An objection must be clear enough to apprise the court of the nature of the objection (see CPLR 4017; Sabin-Goldberg v Horn, 179 AD2d 462, 464 [1992]), and the record in this case makes clear that defense counsel's objection was premised on the court's initial "fundamental error" rationale. Given the lengthy colloquy on the subject, the court obviously was aware of the nature of the objection and, more importantly, it recognized that the issue would be subject to appellate review. Additionally, at the time the court made its ruling, there was no indication in the record that defendant consented to the procedure. In short, counsel made the objection known, the court heard from both sides, and it then issued a ruling, preserving the issue for our review.

Defendants' remaining arguments do not merit any further relief. Defendants Pillard, Marie and D'Angelico argue that the

liability verdict should be vacated because of two charging errors committed by the trial court in its instructions on the failure-to-accommodate and hostile-work-environment claims. These arguments are unpreserved for appellate review since defense counsel failed to object on these grounds either before or after the court's instructions.[2]

The first claimed error is the court's instruction to the jury that Pillard was an "employer" under the state Human Rights Law. Pillard never objected to this instruction, which, in any event, was appropriate. Pillard, as cofounder, president and a 10% shareholder of Elite, with significant managerial responsibilities, clearly met the test for employer status set out by the Court of Appeals in *Patrowich v Chemical Bank* (63 NY2d 541, 543-544 [1984]; *see also Brotherson v Modern Yachts*, 272 AD2d 493, 494 [2000] [corporate employee may be subject to individual liability under Human Rights Law if he or she has an ownership interest in corporate employer]).

The second charge error alleged by Pillard similarly relates to the court's instructions on individual liability under the state Human Rights Law. With respect to the failure-to-accommodate claim as against Casablancas and Pillard individually, the court instructed:

> "Under the State Human Rights Law if an individual has an ownership in the company or [ ] has managerial authority to make personnel decisions such as hiring, firing or controlling work conditions, then he or she may be liable for the unlawful actions of an employee or agent. . . .
>
> "[I]f you find that *any responsible employee or agent of Elite* unlawfully failed to accommodate plaintiff's disability, you may find Casablancas and Pillard individually liable under the State Human Rights Law" (emphasis added).

Pillard contends on appeal that this instruction constituted reversible error since the court failed to include an additional charge that notwithstanding her "employer" status under the law, she could not be held liable unless the jury found that she became a party to the discrimination by "encouraging, condon-

---

**2.** Although defendants Marie and D'Angelico raise these charge errors in their brief, the record shows that the subject charges related only to Casablancas and Pillard, and thus have no relevance to the former. Only Pillard's arguments will therefore be discussed.

ing or approving" of the discriminatory acts of an employee or agent, citing *Matter of Totem Taxi v New York State Human Rights Appeal Bd.* (65 NY2d 300, 305 [1985]). She complains that by instructing the jury that she was plaintiff's employer and that she may be found liable for the acts of "any responsible employee or agent of Elite," the court essentially imposed a strict liability standard.

This specific argument is unpreserved for appellate review. Although Pillard's counsel did suggest at the precharge conference that the proposed instruction suggested "automatic" liability for the acts of subordinates, her sole specific request to the court was that it omit any reference to any "employee or agent of Elite" from the second-quoted paragraph above, and simply limit the phrase to the word "Elite" ("If you find that Elite unlawfully failed to accommodate plaintiff's disability"). Now, on appeal, Pillard makes a different argument—that the court should have instructed the jury that she could not be found liable unless she "encourag[ed], condon[ed] or approv[ed]" of an employee's discriminatory conduct. As indicated, however, she never made this request before the trial court, but instead insisted on the limitation mentioned above.

More to the point, however, is the fact that her suggested limitation would have done nothing to advance her appellate contention that the court should have included language to negate a strict liability standard. In fact, if the subject phrase was limited to the word "Elite," as requested, the charge still would not have required a jury finding that Pillard bore any personal blame for the discriminatory acts, since the term "Elite" could refer to the company alone or any number of unidentified persons. Moreover, it was plaintiff's counsel, not Pillard's, who convinced the court to insert the term "responsible" before the phrase "employee or agent," in order to suggest that no liability would exist unless management persons such as Pillard were involved in the discriminatory conduct. Accordingly, since Pillard's request for an instruction that she could not be liable unless she was a party to the discriminatory conduct of others was made for the first time on appeal, it is unpreserved for appellate review.

In any event, were any error to exist, we would find it harmless since the jury was instructed on the city Human Rights Law claim that the individual defendants must have been "responsible for, assisted or failed to rectify" the discriminatory conduct in order to be held liable, and thus did consider the is-

sue of Pillard's individual complicity. Moreover, the trial evidence overwhelmingly established Pillard's condonation and approval of the failure to accommodate plaintiff's disability.

Finally, we need not consider defendants' arguments concerning the amount of the damage awards in light of our determination to remand for a new trial on damages due to the improper substitution of alternate jurors.

Accordingly, the judgment of the Supreme Court, New York County (Louis B. York, J.), entered January 8, 2004, which, after a jury trial, awarded plaintiff damages in the amount of $1,886,419.48 as against all defendants, and $2,765,402.74 in punitive damages as against defendant Elite, and bringing up for review an order, same court and Justice, entered January 8, 2004, which granted defendants' posttrial motions only to the extent of vacating the jury's award for pain and suffering and ordering a new trial on those damages unless plaintiff stipulated to a reduced award of $1.1 million, to which plaintiff stipulated, should be modified, on the law, the motion granted to the additional extent of vacating the jury's damages verdict and remanding the matter for a new trial on the issue of damages only, and otherwise affirmed, with costs in favor of plaintiff payable by defendant Mary Ann D'Angelico.

MAZZARELLI, J.P., SAXE, ELLERIN and CATTERSON, JJ., concur.

Judgment, Supreme Court, New York County, entered January 8, 2004, modified, on the law, the motion granted to the additional extent of vacating the jury's damages verdict and remanding the matter for a new trial on the issue of damages only, and otherwise affirmed, with costs in favor of plaintiff payable by defendant Mary Ann D'Angelico.