Beverly ZAKRE, Plaintiff,

v.

NORDDEUTSCHE LANDESBANK GIROZENTRALE, Defendant.

No. 03 Civ. 257.

United States District Court, S.D. New York.

Feb. 8, 2008.

559

Vladeck, Waldman, Elias & Engelhard, P.C. by Anne L. Clark, Esq., Karen Cacace, Esq., New York, NY, for Plaintiff.

McDermott Will & Emery LLP by Joel E. Cohen, Esq., Carolyn T. Schiff, Esq., Katherine D. Kale, Esq., New York, NY, for Defendant.

### OPINION

SWEET, District Judge.

Defendant Norddeutsche Landesbank Girozentrale ("Nord/LB," the "Bank," or the "Defendant") has moved under Rule 50(b), Fed.R.Civ.P., to set aside the punitive damage award in favor of plaintiff Beverly Zakre ("Zakre" or the "Plaintiff") and alternatively under Rule 59(a) and (e), Fed.R.Civ.P., for a new trial or remittitur.

Zakre has also moved for attorneys' fees and costs pursuant to Title VII, 42 U.S.C. § 2000e–5(k), and the New York City Administrative Code, N.Y. City Admin. Code § 8–502(f), and for reinstatement with pension credit, and interest, pursuant to Fed.R.Civ.P. 59(e), and federal, state and city law.

For the reasons set forth below, the motion to set aside is denied, and the motion for a remittitur with respect to punitive damages is granted. The motion for attorneys' fees and costs is granted, and the motion for reinstatement is denied.

### Prior Proceedings

On April 23, 2007, after a ten-day trial, a jury found that the Bank discriminated against Zakre because of her gender and retaliated against her because of her opposition to unlawful employment actions, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); the New York State Human Rights Law, N.Y. Exec. §§ 296–301 ("Executive Law"); and the Administrative Code of the City of New York §§ 8–107–8–131 ("City Law"). The jury awarded Zakre $1,348,971 in lost wages and benefits, $100,000 for emotional distress, and $2,500,000 in punitive damages.

On April 30, 2007, the Managing Clerk at McDermott Will & Emery, counsel for Defendant, noted that the electronic docket in this case reflected that judgment had been entered by the Court on April 27, 2007. The judgment was entered on April 26, 2007. Nord/LB filed this motion on May 10, 2007, and on May 11, 2007, filed an amended memorandum of law raising an additional argument. The instant motion was heard and marked fully submitted on June 6, 2007.

### The Standards under Rule 50 and Rule 59

A motion for judgment as a matter of law pursuant to Rule 50(b) is appro-

priately granted only when the Court determines that "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." *Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 120 (2d Cir.1998). In connection with a 50(b) motion, "the trial court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Tolbert v. Queens College,* 242 F.3d 58, 70 (2d Cir.2001) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir.1988)). "The court cannot assess the weight of conflicting evidencing, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Id.* Moreover:

> In making its evaluation, the court should 'review all the evidence in the record,' but 'it must disregard all evidence favorable to the moving party that the jury is not required to believe ....' That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.

*Id.* (emphasis in original, internal citations omitted) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

 The standard for granting a new trial pursuant to Rule 59, Fed.R.Civ.P., is less stringent than that for judgment as a matter of law. *See Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970 (2d Cir.1987); *Bseirani v. Mahshie,* 881 F.Supp. 778, 783 (N.D.N.Y.1995), aff'd, 107 F.3d 2 (2d Cir.1997). On a motion for new trial, the judge may grant a new trial even if there is substantial evidence to support the jury's verdict. *Song v. Ives Laborato-*

*ries, Inc.,* 957 F.2d 1041, 1047 (2d Cir. 1992). The court may weigh the evidence for itself without viewing it in the light most favorable to the verdict winner. *See id.; Paper Corp. of the U.S. v. Schoeller Technical Papers, Inc.,* 807 F.Supp. 337, 347 (S.D.N.Y.1992). Still, a new trial may only be granted if "the court is convinced that the jury has reached a seriously erroneous result, or that the verdict is against the weight of the evidence, making its enforcement a miscarriage of justice." *Lightning Bolt Prods., Inc.,* 861 F.2d at 370; *Taylor v. National R.R. Passenger Corp.,* 868 F.Supp. 479, 484 (E.D.N.Y. 1994). Moreover, "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Piesco v. Koch,* 12 F.3d 332, 345 (2d Cir. 1993) (citing *Metromedia Co. v. Fugazy,* 983 F.2d 350, 361 (2d Cir.1992), cert. denied, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993)).

 If a district court finds that a verdict is excessive, it may order a new trial, order a new trial limited to damages, or, under the practice of remittitur, condition denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount. *See Tingley Systems, Inc. v. Norse Systems, Inc.,* 49 F.3d 93, 96 (2d Cir.1995) (citing *Phelan v. Local 305 of the United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus.,* 973 F.2d 1050, 1064 (2d Cir.1992), cert. denied, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993)). However, it is not among the powers of the trial court, where the jury has awarded excessive damages, simply to reduce the damages without offering the prevailing party the option of a new trial. *See id.* (citing *Vasbinder v. Scott,* 976 F.2d 118, 122 (2d Cir.1992)).

### The Rule 50(b) Motion is Timely

 Zakre has contended that this portion of the Nord/LB motion is untimely in that the Defendant raised its challenge to the back pay award on May 11, 2007, and raised only issues relating to the insufficiency of the evidence as to the failure to promote claim and as to pretext with respect to termination in its Rule 50(b) motion at the close of the Plaintiff's case. Zakre also noted that Nord/LB did not renew its 50(b) motion at the close of all evidence.

However, effective December 1, 2006, Fed.R.Civ.P. 50(b) was amended to delete the requirement that a Rule 50(a) motion for judgment as a matter of law made before the close of all the evidence must be renewed at the close of all the evidence. As explained in the 2006 Notes of the Advisory Committee:

> This change responds to many decisions that have begun to move away from requiring a motion for judgment as a matter of law at the literal close of all the evidence. Although the requirement has been clearly established for several decades, lawyers continue to overlook it. The courts are slowly working away from the formal requirement. The amendment establishes the functional approach that courts have been unable to reach under the present rule and makes practice more consistent and predictable.

Fed.R.Civ.P. 50 Advisory Committee Notes (2006).

Nord/LB challenged the sufficiency of the evidence to support an award on liability, stating that there was no evidence that Defendant was motivated by improper animus. Trial Tr. 1081; *Cruz v. Local Union No. 3 of the IBEW*, 34 F.3d 1148, 1155 (2d Cir.1994) (explaining that appellant could have challenged the sufficiency of the evidence for a damage award if not the award itself) (citing *W.W.W. Pharm. Co. v. Gillette Col.*, 984 F.2d 567, 570 (2d Cir.1993) (explaining appellee moved for judgment as a matter of law in the district court "on the ground that there was no legally sufficient basis for a reasonable jury to find for the plaintiff[-appellant]")). Plaintiff concedes that Defendant moved for judgment as a matter of law at the close of Plaintiff's case.

The instant motion was timely and the grounds upon which it was based are appropriate for consideration.

### Punitive Damages Were Appropriate

 Nord/LB has contended that the punitive damage award was against the weight of the evidence. An award of punitive damages is warranted in a Title VII action where an employer discriminates "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b) (*l*). In *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court explained that the terms "malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law. *Id.* at 535–36, 119 S.Ct. 2118. The Court stated that to be liable for punitive damages under Section 1981a, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536, 119 S.Ct. 2118. "[A] positive element of conscious wrongdoing is always required." *Id.* at 538, 119 S.Ct. 2118 (internal quotation marks and citation omitted).

 An employer does not have the requisite state of mind if it "discriminated with the distinct belief that its [alleged] discrimination is lawful," even if that belief is erroneous. *Id.* at 537, 119 S.Ct. 2118. According to Nord/LB, the Second Circuit has explicitly held that where the employer acts pursuant to advice that its action is

consistent with the law, an award of punitive damages cannot stand under *Kolstad. Farias v. Instructional Sys. Inc.,* 259 F.3d 91, 102 (2d Cir.2001); *see also Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 236 (2d Cir.2000).

In *Farias,* the Second Circuit affirmed the district court's denial of punitive damages as a matter of law where the defendant had consulted with counsel before engaging in conduct found to violate Title VII. 259 F.3d at 101–02. The Court held that "whether or not the advice was appropriate, action taken pursuant to advice that the action is consistent with the law is insufficient to support an award of punitive damages under the standard articulated in *Kolstad." Id.* at 102. Similarly, in *Weissman,* the Second Circuit affirmed the district court's determination that punitive damages were barred as a matter of law where, *inter alia,* the defendant had consulted with counsel before engaging in conduct violative of Title VII. 214 F.3d at 235–36.

Here, it was established that Nord/LB began consulting with counsel immediately upon receipt of the January 7, 2002, lawyer's letter on Zakre's behalf alleging discrimination, and did so continuously throughout the entire duration of this lawsuit. Moreover, Nord/LB did not terminate Zakre until it consulted with counsel.

■ The Supreme Court in *Kolstad* recognized limited situations in which intentional discrimination does not give rise to punitive damages: (1) where the employer is unaware of the federal prohibition on discrimination/retaliation; or (2) where the employer discriminates with the belief that its discrimination was lawful, either because the "underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability." *Id.* at 536–37, 119 S.Ct. 2118.

Here, Nord/LB's decisionmakers testified that they knew that discrimination and retaliation were illegal. *See Zimmermann v. Assoc. First Capital Corp.,* 251 F.3d 376, 385 (2d Cir.2001) (finding that acknowledged training in "equal opportunity" permitted an inference of the requisite mental state for punitive damages); *Parrish v. Sollecito,* 280 F.Supp.2d 145, 152–53 (S.D.N.Y.2003) (finding that defendant's attempt to institute a sexual harassment policy, as well as prior experience with legal counsel regarding a sexual harassment claim, constituted sufficient evidence to support a jury award of punitive damages); *Kuper v. Empire Blue Cross & Blue Shield,* No. 99 Civ. 1190, 2003 WL 359462, at *5 (S.D.N.Y. Feb. 18, 2003) (upholding a punitive damage award based upon, *inter alia,* a decision-maker's testimony that she was aware of laws prohibiting discrimination based on disability). There is no claim that the failure to promote Zakre, the creation of a hostile work environment, or the firing of Zakre met any statutory exceptions or involved any novel or unresolved legal theories. *See Greenbaum v. Handelsbanken, N.Y.,* 67 F.Supp.2d 228, 262–63 (S.D.N.Y.1999) (Sotomayor, C.J., sitting by designation) (noting that evidence supporting liability may also support punitive damages, especially where "the illicit activity is an unexceptional and paradigmatic type of discrimination, one that is commonly recognized as prohibited").

■ Here, the reliance on the advice of counsel, asserted by Nord/LB as precluding punitive damages, does not negate the requisite intent. In *Farias,* the defendant, on advice of counsel, believed that offering severance conditioned on a release of all claims to a person who filed an EEOC charge after her employment was termi-

nated, but before severance was offered, would be viewed as coercive. The advice given for the isolated and somewhat unusual incident was a defense to punitive damages, but not liability. 259 F.3d at 102. In *Weissman,* the court did not directly address whether consulting counsel need necessarily be considered dispositive, as the plaintiff conceded that discussions with counsel sufficed to eliminate the possibility that the defendant was acting "in reckless disregard" for the plaintiff's rights. 214 F.3d at 235–36.

 In both *Farias* and *Weissman,* the defendants disclosed the advice of counsel. *Farias,* 259 F.3d at 96; *Weissman,* 214 F.3d at 228. Here, while there was testimony that Nord/LB consulted with counsel or had documents reviewed by counsel, there is no evidence as to what counsel told the Bank. In *Greenbaum,* 67 F.Supp.2d at 262–64, the court rejected an "advice of counsel" defense, concluding that consultation with counsel did not establish as a matter of law that the defendant attempted to comply with antidiscrimination laws. Where there are no novel legal issues or conflicting legal obligations, consultation with counsel may merely demonstrate that a defendant was aware of laws against discrimination and retaliation. *Id.* (citing *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 467 (2d Cir.1989)).

Nord/LB has also contended that punitive damages must be vacated because there was not sufficient evidence of the requisite intent on the part of Juergen Koesters ("Koesters"), who, according to Nord/LB, was the decision-maker with respect to the denial of promotion and the termination.

Initially, in denying defendant's motion for a directed verdict on liability, the Court determined that there was evidence from which the jury could have found that Jens Westrick ("Westrick"), the general manag-

er of the New York branch, was involved in both selecting Alessandro Gajano ("Gajano") and rejecting Zakre for the position of Treasurer. There was testimony relating to bias exhibited by Westrick.

There was also evidence that Koesters displayed biased attitudes, such as being able to think of only two women he had promoted in his current and prior jobs, his statements that Aimee Srebnik's ("Srebnik") complaints that Gajano had discriminated against Srebnik at her last job were "not serious" and were no reason to question giving Gajano the job of Treasurer, his negative response when Maria Spinelli ("Spinelli") complained of sex discrimination in promotions and of Gajano's abusive conduct, and his instructions to Gajano to be nice to Andrea Rudzwick ("Rudzwick") in order to use her against Zakre.

In addition, the jury found a discriminatory and retaliatory hostile work environment. There was testimony that Gajano was the prime player in creating such an environment and that Westrick continued to be involved. There was also conflicting testimony with respect to the firing of Zakre, namely that, according to Koesters, Gajano decided to file her and, according to Gajano, Koesters made the decision. *See Chalfant v. Titan Distribution, Inc.,* 475 F.3d 982, 991–92 (8th Cir.2007) (finding punitive damages appropriate where, *inter alia,* no one took responsibility for employment decision and instead each person denied involvement, as such conduct could show that defendant was aware it may have been acting in violation of federal law).

Sufficient evidence has been adduced to warrant the jury's award of punitive damages.

### The Punitive Damage Award Was Excessive

 A district court may refuse to uphold a punitive damage award when the

amount is "so high as to shock the judicial conscience and constitute a denial of justice." *Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir.1996) (quoting *Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc.,* 850 F.2d 876, 883 (2d Cir.1988)) (internal quotation marks and citation omitted); *Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 683 (2d Cir.1993). In reviewing a punitive damages award, the court must bear in mind its purpose, which is "to punish the defendant and to deter him and others from similar conduct in the future." *Id.* (citing *Vasbinder,* 976 F.2d at 121). A punitive damages award will not be upheld where it is so "grossly excessive" that it "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Mody v. General Electric Co.,* No. 04 Civ. 358(WWE), Slip. Op., 2007 WL 3025289, at *6 (D.C.T. Oct. 15, 2007) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 417, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

■ In *BMW of North America Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court set forth three categories of factors to be considered in assessing the validity of a punitive damage award. These factors include: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Gore,* 517 U.S. at 574–75, 116 S.Ct. 1589; *see also Lee,* 101 F.3d at 809.

*Reprehensibility of Defendant's Conduct*

■ Of the *Gore* factors, the Supreme Court identified the first, degree of reprehensibility, as "[p]erhaps the most important indicium of reasonableness of a punitive damages award." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. The Court enumerated five aggravating factors for courts to consider when evaluating reprehensibility: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm,* 538 U.S. at 419, 123 S.Ct. 1513.

With respect to the first and second factors, Zakre did not suffer any physical injury as a result of Nord/LB's alleged wrongdoing, and Nord/LB did not engage in any conduct that threatened the health or safety of others.

With respect to the third factor, Zakre testified that after her termination she looked into purchasing several businesses with asking prices ranging from $460,000 to $750,000 and worked for seven months at a start-up hedge fund for no salary or benefits. In addition, she testified that she was offered a separation package of ten months salary (approximately $120,000) in connection with her termination, which she declined. At the time Zakre was terminated, she had one child in college and another approaching college, her husband had retired, and she was the sole wage earner for the family.

As to the fourth factor, there was evidence of discriminatory conduct over time affecting Zakre from the time she was denied the Treasurer's post until her termination almost four years later. In addition, there was also extensive evidence of discrimination against women generally at Nord/LB. Complaints about discrimination and suggestions regarding training on

equal employment opportunity laws were dismissed.

As to the fifth factor, intentional malice or deceit as opposed to accident, there was evidence that Koesters gave Zakre conflicting statements concerning the selection of Gajano for Treasurer, that Rudzwick was used as a pawn against Zakre, that Zakre was treated differently from other employees seeking verification for a mortgage, that she was criticized unfairly after arrival of the letter from her counsel, that her career prospects and responsibilities were limited, and that she was demoted from Deputy Treasurer and top employee in Capital Markets. Westrick's direction to Gajano to put pressure on Zakre, Spinelli, and Srebnik, and his direction to listen in on Zakre's telephone calls, do not evidence accident.

*Disparity Between Punitive Damages Award and Harm Suffered*

██ Although there is no "bright-line ratio which a punitive damages award cannot exceed," the Supreme Court has held that "[s]ingle digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513. Furthermore, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* Of course, "[t]he precise award in any case ... must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

Here, the ratio of punitive to compensatory damages awarded by the jury is less than 2:1. However, the compensatory damages award was substantial, *see Watson v. E.S. Sutton, Inc.,* No. 02 Civ. 2739(KMW), 2005 U.S. Dist. LEXIS 31578, at *55 (citing *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513, for the proposition that a

$1 million compensatory damages award is "substantial"), indicating that a reduction of the punitive damage award, if warranted by the circumstances of the case, would not be inappropriate.

*Disparity Between Punitive Damages and Civil Penalties Imposed in Comparable Cases*

The maximum damages award available under Title VII is $300,000. *See* 42 U.S.C. § 1981a (b)(3)(d). The New York Human Rights law prohibits the imposition of punitive damages altogether in an employment discrimination action. N.Y. Exec. Law § 297(9). The City Law permits punitive damages, without a limitation on the maximum amount, in employment discrimination cases. N.Y. City Admin.Code § 8–502(a). As only the City Law allows for punitive damages above $300,000, "most 'comparable cases' (that is, New York State and Title VII discrimination claims) have allowed punitive damages of only $ 300,000 or less." *Watson v. E.S. Sutton, Inc.,* No. 02 Civ. 2739(KMW), 2005 U.S. Dist. LEXIS 31578, at *56 (citing *Luciano v. Olsten Corp.,* 110 F.3d 210, 222 (2d Cir.1997)); *cf. Thomas v. iStar Financial, Inc.,* 508 F.Supp.2d 252, 253 (S.D.N.Y. 2007) ("[T]he federal cap ... provides guidance on what is considered an appropriate civil penalty for comparable misconduct.") (citations omitted).

Because Title VII has a cap on punitive damages, and the Executive Law does not provide for punitive damages, there is not a large pool of relevant cases, those with punitive damages awards under the City Law. *Greenbaum,* 67 F.Supp.2d at 268. A reviewing court may look not only at the caps under Title VII, but also, for example, at the liquidated damages provision of the Age Discrimination in Employment Act, 29 U.S.C. § 626(b), or the unlimited punitive damages under the Fair Housing Act, 42 U.S.C. § 3613(c). *See id.* at 271.

Comparison to punitive damage awards in comparable cases indicates that a reduction of the punitive damages award in this case is appropriate. For example, in *Watson*, 2005 U.S. Dist. LEXIS 31578, in which the defendant was found liable for retaliation under Title VII, the Executive Law, and the City Law, the court reduced a punitive damages award from $2.5 million to $717,000 (approximately 50 percent of the compensatory damages award), noting that although such an award was "less than the maximum than would be constitutionally permissible," it was "within the range within range of the awards given in comparable cases brought under only federal and state law, but still reflect[ed] the additional damages available under the City code" and was "substantial enough to deter, while not being unduly burdensome." *Id.* at *57.

As the Second Circuit suggested in *Greenbaum*, it is useful to compare damages awards not in absolute terms, but by reference to the *Gore* factors. *Greenbaum*, 67 F.Supp.2d at 271. In *Bell v. Helmsley*, Index No. 111085/01, 2003 WL 1453108 (March 4, 2003), employing a *Gore* analysis, a New York court reduced a punitive damages award of $10 million to $500,000. The *Bell* court noted that in *McIntyre v. Manhattan Ford*, 256 A.D.2d 269, 682 N.Y.S.2d 167 (1998), a case involving "far more egregious" behavior than involved in *Bell*, including physical assault, the court "capped punitive damages at $1.5 million." *Bell*, 2003 WL 1453108, at *5. In *Thomas*, 508 F.Supp.2d 252, cited by Nord/LB, the court reduced a punitive damages award under the City law from $1.6 million to $190,000, where the plaintiff had been awarded $190,000 in back pay and the court stated that while there was "certainly sufficient evidence of reprehensible conduct to warrant a punitive damage award, the reprehensibility should not be overstated." *Id.* at 262.

In opposition to the motion for remittitur, Zakre points to *Mody v. General Electric Co.*, No. 04 Civ. 358(WWE), Slip. Op., 2007 WL 3025289, at *6 (D.C.T. Oct. 15, 2007), in which the court awarded $5 million in punitive damages, reducing the jury's initial award of $10 million. The *Mody* court noted that the Title VII and ADEA damages caps "weigh[ed] in favor of reducing the jury's punitive damages award," and stated that in light of its *Gore* analysis, as well as the deterrent and punitive purposes of the award, a $5 million award was appropriate, although "in the upper range on the constitutionally-permitted punitive damages." *Id.* at *8.

Zakre also cites *Gallegos v. Elite Model Mgmt. Corp.*, 28 A.D.3d 50, 807 N.Y.S.2d 44 (2004), which concerned an asthmatic plaintiff who was forced to sit in a room among heavy smokers in violation of anti-smoking laws, which caused her to become extremely physically ill, and who was then terminated for complaining. In *Gallegos*, the court upheld a punitive damages award of approximately $2.6 million, in addition to $1.1 million in compensatory damages, under the New York State Executive Law and the City Law.

Unlike the instant case, both *Mody* and *Gallegos* involved behavior demonstrating disregard for the health of the plaintiffs. In *Mody*, the court noted that a reduction in punitive damages was warranted, in part, because the case involved no violence or indifference to the health and safety of a broad scope of individuals. However, in support of the $5 million ultimately awarded, the court noted that the defendant's actions resulted in the plaintiff's "health-threatening" stress and that the defendant's conduct was made "more reprehensible by the fact that [he] was aware that plaintiff required dialysis." *Mody*, 2007 WL 3025289, at *8.

In view of the *Gore* factors considered above, the remedial purpose of the City Law, punitive damage awards in comparable cases, and the roughly $1.5 million dollar award for compensatory damages, a punitive damage award in the amount of $600,000 is appropriate and a remittitur to that amount is directed. If Zakre does not accept the remittitur, the punitive damage award will be vacated and a new trial will be conducted on that limited issue. *See Vasbinder,* 976 F.2d 118, 123 (2d Cir.1992).

### The Back Pay Award is Supported by the Evidence

Nord/LB has challenged the back pay award on a variety of grounds. Nord/LB has contended that the salary of Gajano was an improper basis for consideration, that Zakre's prior salary was controlling, that the Treasurer's position was eliminated in 2006, and that mathematical miscalculations were presented to the jury by Zakre.

Under the governing standard for review of damages, cited by Zakre, "[a] jury's determination of damages must stand unless, after according substantial deference to the jury's findings of fact, the court concludes that the amount awarded is so high as to shock the judicial conscience and constitute a denial of justice." *Dailey v. Societe Generale,* 915 F.Supp. 1315, 1324 (S.D.N.Y.1996), *aff'd in relevant part,* 108 F.3d 451 (2d Cir.1997) (quoting *Blissett v. Coughlin,* 66 F.3d 531, 536 (2d Cir.1995) (citations omitted)). Under Title VII, any doubts in calculating lost compensation should not benefit the defendant. *See Malarkey v. Texaco, Inc.,* 794 F.Supp. 1237, 1243–44 (S.D.N.Y.1992), *aff'd,* 983 F.2d 1204 (2d Cir.1993); *Koyen v. Consolidated Edison Co.,* 560 F.Supp. 1161, 1169 (S.D.N.Y.1983).

However, Nord/LB asserts that while back pay remedy under Title VII "is intended to make the victims of unlawful discrimination whole," *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), it should not result in a plaintiff receiving a windfall. *See Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 412 (S.D.N.Y.1996) (citation omitted). According to Nord/LB, the jury's award of $ 1,348,971 in back pay for Zakre's failure to be promoted to Treasurer in 2001 and her termination in 2005 is grossly excessive.

The use of the salary of Gajano, who was selected as Treasurer, for the back pay calculation was appropriate. This basis has been used in other cases. *See, e.g., Malarkey,* 794 F.Supp. at 1242; *EEOC v. Delight Wholesale Co.,* 973 F.2d 664, 668–70 (8th Cir.1992); *Stallworth v. Shuler,* 777 F.2d 1431, 1434–35 (11th Cir.1985). The testimony did not indicate that Nord/LB had a standard practice for setting compensation, since some new employees were paid more to attract them away from current employer and, in other instances, long-term employees were paid more than recent arrivals and some employees took pay cuts to join Nord/LB. The evidence on these practices was all presented to the jury and provided a rational basis upon which to calculate back pay for Zakre.

There was also extensive evidence that women, including Zakre, were paid a lower wage. The contention of Nord/LB, essentially to project plaintiff's discriminatory wages forward, is contrary to the purposes of Title VII.

The elimination of the post of Treasurer after Zakre's termination did not establish that Zakre would have been terminated given her work in Capital Markets. *See Banks v. Travelers Cos.,* 180 F.3d 358, 363–64 (2d Cir.1999) (holding that trial court erred in instructing jury that it could not award lost wages for the period after plaintiff's position was eliminated). It is

relevant that Kevin Berger ("Berger") was asked to stay on after tendering his resignation, and was replaced by Sam Weinstock ("Weinstock"), who, at the time of trial, was responsible for Capital Markets with the title of Senior Vice President. The compensation paid to Berger, Weinstock and Robert Fakhoury was also evidence relevant to the back pay determination.

Nord/LB has also challenged the testimony of Antonio Fernandez ("Fernandez"). Fernandez made basic mathematical calculations comparing Zakre's compensation to that of Gajano based on Gajano's average raises. It was reasonable to project total compensation for Gajano for 2006, as his actual compensation did not accurately reflect what someone who remained employed would have received. Gajano was terminated in January 2006 and was paid only his base pay under his contract and did not receive any bonuses. Nord/LB received the damages charts prepared by Fernandez before trial, including the 15.06% raise figure, and at no time before or during trial raised the alleged mathematical error or cross-examined Fernandez on it, or argued it to the jury. Nord/LB did not present to the jury any of the calculations it now has contended are inappropriate.

The jury's award has sufficient support in the record. ·

### The Compensatory Damages Award is Supported by the Evidence

■ The jury award of $100,000 to compensate plaintiff for the emotional distress she suffered as a result of the Bank's discrimination and retaliation has also been challenged by Nord/LB. However, the award does not "shock the judicial conscience and constitute a denial of justice." See O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir.1988) (citing Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir.1978)). "Refer-

ence to other awards in similar cases is appropriate," Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir.1990) (citation omitted), but courts must take care not to limit their review too narrowly. See id. at 186–87 (finding, in reversing remittitur and reinstating $650,000 in compensatory damages, that that district court should not have limited its review to Section 1983 cases).

■ To recover compensatory damages, a plaintiff need not proffer expert testimony and "[m]ental injury may be proved by the [plaintiff's] own testimony, corroborated by reference to the circumstances of the alleged misconduct." New York City Transit Auth. v. State Div. of Human Rights, 78 N.Y.2d 207, 216, 573 N.Y.S.2d 49, 577 N.E.2d 40 (1991). Moreover, as the New York Court of Appeals has stated, "recovery should not be based solely on common-law strictures as would be applied in determining liability for a tort. Recovery here, instead, is based on a statute which effectuates a State policy against discrimination." Batavia Lodge No. 196 v. New York State Div. of Human Rights, 35 N.Y.2d 143, 145, 359 N.Y.S.2d 25, 316 N.E.2d 318 (1974).

■ When questioned about the effects of not receiving the promotion to Treasurer in 2001, Zakre testified: "I was depressed. I had difficulty sleeping. I was very tense about going to work." Trial Tr. 192. She also testified that "I became pretty short with [my family] in terms of I had less patience than I had in the past . . . ." Trial Tr. 192–93. When asked about the emotional effects due to the harassment she suffered after 2001, Zakre testified that in 2003, for the first time in her life, she sought treatment from a psychologist. She went to the psychologist because she "ended someplace to go to express how [she] was feeling and start to deal with the stress that [she] was under." Trial Tr. 194. Plaintiff continued to receive treat-

ment through the date of the trial. Zakre testified that after she was fired by Norad/LB, she was humiliated, and it was difficult for her to explain the firing to people, including her family.

Zakree's husband testified that after she did not receive the promotion to Treasurer in 2001, "[s]he was upset, a little bit short-tempered ...." Trial Tr. 826. Mr. Zakre also testified that from 2002 through 2005, when Zakre was subjected to harassment, she "was a little more combative towards us" and he suggested she see a therapist to work through the stress she was under. Trial Tr. 827. Spinelli testified that she observed that as a result of Gajano's treatment of Zakre, Zakre "lost a lot of her spirit, her morale." Trial Tr, 886. Rudzwick testified that on one occasion she observed that Zakre was so upset by Gajano's treatment that she was "shaking." Trial Tr. 985. Mr. Zakre also testified that after plaintiff was fired, she was humiliated and embarrassed, and that she "didn't want to do things that we had normally done, go to the theater, go out with friends." Trial Tr. 827–28.

This evidence is sufficient to substantiate the jury verdict of $100,000 in emotional distress damages.

In 2004, the Second Circuit noted that "New York cases vary widely in the amount of damages awarded for mental anguish." *Meacham v. Knolls Atomic Power Laboratory*, 381 F.3d 56, 77–78 (2d Cir.2004) (upholding district court award of $125,000 in emotional distress for plaintiffs that had "no proof other than testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress" and $175,000 where "either physical sequelae or professional treatment was established"), *vacated on other grounds*, *KAPL, Inc. v. Meacham*, 544 U.S. 957, 125 S.Ct. 1731, 161 L.Ed.2d 596 (2005). In discussing the range of amounts awarded, the court cited several New York cases

upholding "awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment." *Id.* at 78. In *Osorio v. Source Enterprises, Inc.*, No. 05 Civ. 10029(JSR), 2007 WL 683985, at *5 (S.D.N.Y. March 2, 2007), a court in this district upheld a compensatory damages award of $4,000,000 in an employment discrimination case, based on the plaintiff's emotional distress and damage to her reputation. *See also Patterson v. Balsamico*, 440 F.3d 104, 119–120 (2d Cir.2006) (affirming district court's refusal to reduce $100,000 award for claim of emotional distress in employment discrimination case where award was supported only by plaintiff's testimony and plaintiff did not seek medical treatment); *Quinn v. Nassau County Police Dep't*, 53 F.Supp.2d 347, 362–63 (E.D.N.Y.1999) (upholding a $250,000 emotional distress award in employment discrimination case where plaintiff did not seek counseling until after consulting with an attorney about his case); *Broome v. Biondi*, 17 F.Supp.2d 211, 223–26 (S.D.N.Y.1997) (noting that "large awards have been upheld without signs of tangible harm or medical testimony" and upholding awards of $114,000 to each plaintiff in a housing discrimination case absent evidence of medical treatment).

The jury award for compensatory damages is sustained as within a reasonable range and supported by the evidence.

### Plaintiff's Motion for Attorneys' Fees and Costs is Granted and Motion for Reinstatement is Denied

Zakre has moved for attorneys' fees and costs pursuant to Title VII, 42 U.S.C. § 2000e–5(k), and the City Law, N.Y. City Admin. Code § 8–502(f). Zakre has also moved pursuant to Fed.R.Civ.P. 59(e), and federal, state, and city law, for reinstatement with pension credit and interest.

The parties have submitted their now customary careful and thorough briefing and the issues remaining are the appropriate rate for pre-judgment interest on the back pay award, the amount of Zakre's supplemental request for attorneys' fees, and reinstatement of Zakre.

*Prejudgment Interest at the Federal Rate is Appropriate*

■ Courts in this Circuit considering mixed federal and state law judgments in which back pay is awarded have applied the rate set forth in 28 U.S.C. § 1961(a), *i.e.*, the federal judgment rate and not the New York State rate. *See, e.g., Cioffi v. New York Cmty. Bank*, 465 F.Supp.2d 202, 222 (E.D.N.Y.2006) (applying § 1961(a) to interest on back pay award for violations under Title VII and the New York State Human Rights Law ("NYSHRL") and rejecting plaintiff's argument that the New York State rate of 9% should apply); *James v. AMTRAK*, No. 02 Civ. 3915(RJH)(AJP), 2005 U.S. Dist. LEXIS 5401, at *71–73 (S.D.N.Y. Mar. 30, 2005) (same, collecting cases).

Because this award was made both under Title VII and the state and city laws, rather than as a supplemental claim as in *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir.1998), the appropriate reference is to 28 U.S.C. § 1961, the current federal treasury rate. In addition, the interest must be compounded. *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir.1993) ("Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded.").

*Supplemental Fees are Appropriate*

■ As to the application for Supplemental Attorneys Fees, Zakre has satisfactorily met the objections posed by Nord/LB. The attorney time and disbursements were in fact billed to Zakre. Furthermore, the explanations of time spent cite-checking, opposing the Nord/LB post-trial motions, and researching reinstatement and punitive damages appear to be reasonable, and are in line with awards for post-trial attorney's fees in comparable cases. *See, e.g., Bridges v. Eastman Kodak Co.*, No 91. Civ. 7985(RLC), 1996 WL 47304, at *10 (S.D.N.Y. Feb. 6, 1996) (approving fees for 51 hours spent defending attorneys' fees application, in addition to time spent on preparing the original application).

*Reinstatement is Denied*

■ While Zakre correctly notes that courts in this district have "repeatedly emphasized the importance of equitable relief in employment cases," *Reiter v. MTA New York City Trans. Auth.*, 457 F.3d 224, 230 (2d Cir.2006), in the instant case, reinstatement is not feasible. As Nord/LB states, reinstatement may be denied where the plaintiff's employment term would have already ended by the time of judgment, *Banks*, 180 F.3d at 365 (citation omitted), where reinstatement would displace an innocent third party, *see EEOC v. Century Broad Corp.*, 957 F.2d 1446, 1463 (7th Cir.1992), or "where there employer-employee relationship may have been irreparably damaged," *Kirsch v. Fleet St. Ltd.*, 148 F.3d 149, 169 (2d Cir.1998) (internal quotation marks and citation omitted).

Here, Nord/LB asserts that the position of Treasurer was eliminated in 2006, therefore, even absent the events giving rise to this litigation, Zakre would have been terminated by the date of judgment. The Bank, also states that her former duties have been assumed by another employee, leaving no position available into which to reinstate her.

■ In the instant case, reinstatement is not feasible, given the damaged relationship between the parties. This litigation has been ongoing for over six years, and, although some of the individuals who were actively involved are no longer employed

by Nord/LB, many others still are, including Kosters, Bruno Mejean, Stefanie Scholz, Stephanie Hoevermann, and Laura Barcia.

In addition, it is relevant that as the Head of Capital Markets at Nord/LB, Zakre managed a substantial portfolio. In *Greenbaum,* 979 F.Supp. 973, 987, a case involving gender-based employment discrimination and retaliation, the court stated that "given the highly sensitive nature of plaintiff's prospective position-where she would be dealing directly not only with defendant's clients, but also with vast amounts of their wealth-it would be unwise to grant reinstatement as an equitable remedy." In reaching this conclusion, the court quoted the Second Circuit in *EEOC v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 926–27 (S.D.N.Y.1976), aff'd, 559 F.2d 1203 (2d Cir.1977):

> [T]he job from which plaintiff was discharged required a close working relationship between plaintiff and top executives of defendant. It also involved frequent personal contact with defendant's clients, with plaintiff acting as defendant's representative. Lack of complete trust and confidence between plaintiff and defendant could lead to misunderstanding, misrepresentations and mistakes, and could seriously damage the defendant's relationship with its clients. The situation here is quite unlike that presented when reinstatement is sought for an assembly line or clerical worker, or even for an executive whose job is not as sensitive for his employer's interests as is plaintiff's job here. The Court is convinced that after three and a half years of bitter litigation the necessary trust and confidence can never exist between plaintiff and defendant. To order reinstatement on the facts of this case would merely be to sow the seeds of future litigation,

and would unduly burden the defendant.

Furthermore, Zakre's damages award is sufficient to fully compensate her, making reinstatement or other equitable relief unnecessary. *See, e.g., Barbano v. Madison County,* 922 F.2d 139, 146–47 (2d Cir.1990) (finding no abuse of discretion in trial court's denial of reinstatement and conclusion that plaintiff was made whole by award of back pay of eight and one-half years, prejudgment interest, and attorneys' fees); *Greenbaum v. Svenska Handelsbanken,* 979 F.Supp. 973, 987 (S.D.N.Y.1997) (finding both that there was too much animosity between the parties to make reinstatement feasible and that reinstatement, in addition to the back pay already awarded, would constitute a windfall to the plaintiff); *McIntosh v. Irving Trust Co.,* 873 F.Supp. 872, 879 (S.D.N.Y.1995) (holding that reinstatement would in excess of relief needed to make plaintiff whole where plaintiff had been awarded many years back pay, including prejudgment interest).

### Conclusion

The motion to set aside the jury verdict with respect to the punitive damages, back pay, and compensatory damages is denied and the motion for a remittitur is granted to reduce the punitive damages award to $600,000. The motion for attorneys' fees and costs is granted, and the motion for reinstatement is denied.

It is so ordered.